[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

————————————————

No. 20-10438

————————————————

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

IGOR GRUSHKO,
DENIS GRUSHKO,

Defendants-Appellants.

————————————————

Appeals from the United States District Court
for the Southern District of Florida
D.C. Docket No. 1:18-cr-20859-RS-2

————————————————

Before JORDAN, JILL PRYOR, and MARCUS, Circuit Judges.

MARCUS, Circuit Judge:

Brothers Igor Grushko and Denis Grushko (the "Grushkos") appeal their convictions and the ensuing sentences on multiple counts arising out of their conspiracy to commit access device fraud. The Grushkos and a coconspirator, Vadym Vozniuk, used stolen credit-card information to fraudulently obtain high-value electronic goods from Target Corporation ("Target"). To carry out the scheme and avoid detection, they purchased ordinary household items on Target.com with the stolen credit-card information; designated the orders for pickup and authorized non-existent third parties to pick up the merchandise; displayed fake drivers' licenses bearing the names of these third parties to make the pickups; returned the items in exchange for Target gift cards; and ultimately redeemed the gift cards for high-value electronics. By the time a federal grand jury indicted the conspirators, they had made off with over $110,000 in fraudulently acquired merchandise. After a jury trial, both Denis and Igor were convicted on all counts, and they each received a 145-month total sentence for their fraudulent scheme.

On appeal, the Grushkos argue that: (1) law enforcement agents violated their Fourth Amendment rights by illegally entering their house after arresting them, rendering the subsequent search conducted after obtaining a search warrant illegal; (2) the district court impermissibly lowered the government's burden of

proof during voir dire, warranting a new venire panel; (3) the district court erred in applying two-level enhancements to their base offense levels for possessing device-making equipment; (4) the district court erred in applying two-level aggravating-role enhancements; (5) their total sentences were procedurally unreasonable because the district court failed to adequately explain their sentences, it erroneously miscalculated the loss amounts at issue and it erroneously applied two-level obstruction of justice enhancements; and, finally, (6) their sentences, overall, were substantively unreasonable.

After thorough review of the record and with the benefit of oral argument, we affirm.

I.

In late 2017, Target's fraud prevention team met with a United States Secret Service agent, Logan Workman, to brief the government about a fraud scheme that was directed at Target's South Florida stores. Target investigators explained the workings of the scheme to Agent Workman, detailing how a group of conspirators had been using stolen credit-card information, fake drivers' licenses, and a system of purchases and returns in order to fraudulently obtain high-end electronics from Target. The investigators also gave Workman surveillance footage that captured the license plate number of a vehicle the suspects had used to commit the fraud. Agent Workman traced the license plate number to Sixt Rental Car. A fraud investigator at Sixt gave Workman documentation showing that Igor Grushko had rented the vehicle in

question and had supplied Sixt with his home address. The agent ran a drivers' license check and confirmed the address as Igor's. He further learned that Denis Grushko lived at the same home address as Igor and that Vozniuk lived next door.

While Workman awaited the suspects' indictment, he conducted periodic surveillance of their neighboring homes. He observed and took photographs of "some person" outside of the Grushkos' house, but he could not determine "with [ ] certainty" if "that was Igor Grushko, Denis Grushko, or Vadym Vozniuk, or another roommate that could have been possibly there as well." In November 2018, a federal grand jury sitting in the Southern District of Florida returned a three-count indictment against the Grushkos and Vozniuk, charging all three men with conspiring to commit access device fraud, in violation of 18 U.S.C. § 1029(b)(2) (Count 1), and charging Igor and Vozniuk with using unauthorized access devices, in violation of 18 U.S.C. § 1029(a)(2) (respectively, Counts 2 and 3).

After the indictment was returned, the district court issued arrest warrants for the Grushkos and Vozniuk. In preparation for the execution of the warrants, Agent Workman created an operational plan that specified the team of agents chosen for the operation, the targets' biographical information, and photographs of the targets. For Igor, Workman attached a photograph obtained from Igor's Florida driver's license records -- a source the agents "always use" for their operational plans because a driver's license photograph best depicts a suspect's facial features. For Denis, Agent

Workman attached two photos, one from social media and the other from Target's surveillance footage, because Denis did not have an available Florida driver's license photograph.

At 5:30 a.m. on the day of the arrest, Workman met with the arrest team -- none of whom had been involved in Workman's prior investigation into the scheme -- to distribute the operational plan and "go over photographs" of the targets. Two agents were then sent to conduct "presurveillance" at the Grushkos' home, in part to ensure that, if the Grushkos were to leave, the agents could follow and arrest them. Upon arrival, the agents reported that "two unknown males" were outside the residence smoking cigarettes. They could not positively identify either man.

At around 6:00 a.m., the remainder of the arrest team headed over to the residence and, upon arrival, "confronted the two unknown males out front." As the team approached the men, they announced, "Police. Police. Let me see your hands. Police. Get on the ground." The team detained the men and "asked over and over again what their names were," but the men refused to comply and instead laughed and asked for a lawyer. According to the defendants, the agents then patted them down, removed their wallets and cell phones, and placed the items on the curb. When the agents demanded the code to the padlocked door of the house, the men replied that they did not recall the passcode.

Although it turns out the men were, in fact, the Grushkos, Agent Workman later explained that he was not "a hundred percent certain" of their identities at the time because he had never

seen either Igor or Denis in person. As for Igor, specifically, Workman noted that his appearance differed from his driver's license, "[b]ecause the hair on Igor Grushko was a lot longer" on the day of his arrest.

After the unknown men refused to cooperate and the arrest team was unable to positively identify them, the agents knocked on the padlocked front door and announced their presence. Agent Workman testified that the agents heard "voices and noise" coming from inside the house, but no one opened the door. Suspecting that the Grushkos or possibly Vozniuk may be inside, the agents pried the door open to gain entry into the home. "[A]t th[at] point," the team still had not located all of the targets so the agents conducted a protective sweep. During the sweep, they discovered in plain view in a bedroom credit-card skimming devices and other "access device making equipment." The agents secured the residence and later obtained a search warrant based in part on the items observed in plain view during the protective sweep.

During the search that followed, the agents seized a wide variety of evidence, leading to additional charges in a nine-count superseding indictment. The new charges against Denis and Igor included possession of fifteen or more unauthorized access devices, in violation of 18 U.S.C. § 1029(a)(3) (Count 4); possession of device-making equipment, in violation of 18 U.S.C. § 1029(a)(4) (Count 5); production of a false identification document, in violation of 18 U.S.C. § 1028(a)(1) (Count 6); and aggravated identity theft, in violation of 18 U.S.C. § 1028A(a)(1) (Counts 7–9).

After a three-day trial, the jury found Denis and Igor Grushko guilty on all counts.  Following a sentencing hearing, the district court sentenced each man to a total of 145 months' imprisonment (24 months' imprisonment total for the aggravated identity theft counts, consecutive to the 121 months' imprisonment total for the remaining counts), along with 3 years of supervised release, $122,383.36 in restitution (shared jointly and severally amongst the defendants), and a special assessment.[1]

This timely appeal followed.[2]

## II.

We review a district court's denial of a motion to suppress under a mixed standard, reviewing the trial court's factual findings for clear error and its application of the law to those facts *de novo*. *United States v. Lewis*, 674 F.3d 1298, 1302–03 (11th Cir. 2012).  We review the legal correctness of a jury instruction *de novo*, but we defer to the district court on questions of style and phrasing absent an abuse of discretion. *United States v. Prather*, 205 F.3d 1265, 1270

---

[1] The jury also found Vozniuk guilty on the two counts he was charged with -- conspiracy to commit access device fraud and use of unauthorized access devices -- and the district court sentenced him to a 27-month total sentence, along with 3 years of supervised release, a special assessment, and the same restitution amount shared with the Grushkos.

[2] Although this is a two-defendant appeal, both brothers raise the same challenges to their convictions and their sentences, or adopt the other's arguments as to these issues.  Accordingly, we address their arguments together.

(11th Cir. 2000); *Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1329 (11th Cir. 1999). Meanwhile, we review a "district court's determination whether to strike an entire jury panel for manifest abuse of discretion." *United States v. Trujillo*, 146 F.3d 838, 842 (11th Cir. 1998).

When it comes to sentencing issues, we review *de novo* a claim that the district court double counted enhancement levels. *United States v. Little*, 864 F.3d 1283, 1291 (11th Cir. 2017). However, if a double-counting claim is not raised before the district court, we review it only for plain error. *United States v. Suarez*, 893 F.3d 1330, 1335–36 (11th Cir. 2018). To establish plain error, the defendant must show (1) an error, (2) that is plain, and (3) that affected his substantial rights. *United States v. Turner*, 474 F.3d 1265, 1276 (11th Cir. 2007). If a defendant satisfies these conditions, we may exercise our discretion to recognize the error only if it seriously affects the fairness, integrity, or public reputation of judicial proceedings. *Id.* We review a district court's imposition of an aggravating-role enhancement pursuant to § 3B1.1 for clear error. *United States v. Martinez*, 584 F.3d 1022, 1025 (11th Cir. 2009). And, finally, we review the district court's application of the Sentencing Guidelines *de novo*, but we review the reasonableness of a sentence for abuse of discretion. *United States v. Trailer*, 827 F.3d 933, 935 (11th Cir. 2016); *United States v. Newman*, 614 F.3d 1232, 1235 (11th Cir. 2010).

### III.

### A.

First, we are unpersuaded by the claim that law enforcement officers violated the Fourth Amendment by illegally entering the Grushkos' home after arresting the brothers outside.  The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. CONST. amend. IV.  Accordingly, searches and seizures inside a home without a warrant are presumptively unreasonable. *Payton v. New York*, 445 U.S. 573, 586 (1980).  However, under our case law, law enforcement officers may enter a residence to execute an arrest warrant for a resident of the premises if the totality of the facts and circumstances within the officers' knowledge yielded a reasonable belief that: (1) the location to be searched is the suspect's dwelling; and (2) the suspect is within the residence. *United States v. Magluta*, 44 F.3d 1530, 1535 (11th Cir. 1995).  In other words, the officers need not be "absolutely certain" that a suspect is at home before entering to execute an arrest warrant. *Id.* at 1538.

When evaluating whether the officers' beliefs are reasonable, we are guided by "common sense factors." *United States v. Bervaldi*, 226 F.3d 1256, 1263 (11th Cir. 2000).  The officers may draw reasonable inferences and presumptions based on the time of day or observations at the scene, and these presumptions can be rebutted only by evidence to the contrary. *See Magluta*, 44 F.3d at 1535–36.  "If officers have made such presumptions and have a reasonable belief that a suspect is present somewhere on the premises, they may search the entire premises of a residence, until the suspect

is found." *United States v. Williams*, 871 F.3d 1197, 1201 (11th Cir. 2017). Further, "if the initial entry into the suspect's residence is lawful, the officers are permitted to seize any contraband in plain view within the residence." *Id.*

Nevertheless, "[t]he Fourth Amendment demonstrates a strong preference for searches conducted pursuant to a warrant[.]" *Ornelas v. United States*, 517 U.S. 690, 699 (1996) (quotation marks omitted). And it provides that "no [w]arrants shall issue, but upon probable cause, supported by [o]ath or affirmation." U.S. CONST. amend. IV. In order to establish probable cause, the affidavit must "state facts sufficient to justify a conclusion that evidence or contraband will probably be found at the premises to be searched." *United States v. Martin*, 297 F.3d 1308, 1314 (11th Cir. 2002) (quotation marks omitted). Affidavits supporting search warrants are presumptively valid. *Franks v. Delaware*, 438 U.S. 154, 171 (1978). However, the Fourth Amendment would be violated if the warrant is obtained by using a materially false statement made intentionally or recklessly. *Id.* at 155–56, 171–72.

"Credibility determinations are typically the province of the fact finder because the fact finder personally observes the testimony and is thus in a better position than [this Court] to assess the credibility of witnesses." *United States v. Ramirez-Chilel*, 289 F.3d 744, 749 (11th Cir. 2002). Thus, we afford substantial deference to the fact finder's explicit and implicit credibility determinations. *Lewis*, 674 F.3d at 1303. Indeed, when a law enforcement officer's testimony is in direct conflict with a defendant's testimony, the

"trial judge's . . . choice of whom to believe is conclusive on [this Court] unless the judge credits exceedingly improbable testimony." *Ramirez-Chilel*, 289 F.3d at 749.

Under the totality of circumstances presented, we cannot say that the district court erred in denying the Grushkos' motion to suppress the evidence seized from the house pursuant to a search warrant issued by a neutral magistrate. For starters, the record reflects that the agents had reason to believe that Igor was inside the Grushkos' home and, therefore, that they were authorized to enter the home to execute his arrest warrant. As Agent Workman explained, on the morning of the arrest operation, he and his arrest team arrived at the suspects' house to find two "unknown males" smoking cigarettes outside. After the team detained the unknown men, they repeatedly asked the men to identify themselves, but the men laughed and repeatedly refused. The agents then entered the house to locate the suspects, and at that point, saw in plain sight the evidence the Grushkos now seek to suppress. As it turned out, the two unknown men outside were, in fact, the Grushkos, but Agent Workman did not immediately recognize them, in part because he had never seen them before in person and they had refused to identify themselves.

None of Agent Workman's testimony about being unable to identify Igor was inconsistent or incredible. Indeed, even though the agents had pictures of Igor to use as a reference, his hair had grown significantly since those pictures were taken. As Agent Workman reported, at the time of the arrests, "the hair on Igor

Grushko was a lot longer . . . [s]o at the time . . . he was not readily recognizable based upon the photographs we had." Further, Workman explained that he gave the agents Igor's driver's license photo to identify him -- as he always does -- because "it is directly face on of a suspect and you can see all the facial features." Agent Workman added that he had never seen Denis or Igor up close and in person.

As for the claim that Workman should have used Target surveillance pictures of Igor to identify him, Igor had a beard in those photos, his hair was buzz cut, and he was wearing glasses, none of which was part of his look on the day of the arrest.

As for their claim that the agents could have checked for identification when they restrained the men and removed their wallets from their pockets, Agent Workman said that he was unaware that the wallets had been removed, and, in any event, because the agents had detained the men outside only to effectuate the arrest warrants, the agents were not allowed to search them for their IDs. *See United States v. Campa*, 234 F.3d 733, 738 (11th Cir. 2000) (holding that removal of a wallet and other bulging items from a suspect's person, which were "readily identifiable by touch as non-weapons," exceeded the limits of pat-down searches authorized by *Terry v. Ohio*, 392 U.S. 1 (1968) (emphasis omitted)).

The Grushkos cite to instances where Agent Workman used the word "custody" when referring to the agents' restraint of the brothers, in support of the argument that since the brothers were "in custody," the agents could have -- and should have -- opened

20-10438              Opinion of the Court              13

the wallets to determine their identities.  However, the substance
of Workman's testimony makes it abundantly clear that the agents
had not placed the men in custody but instead had detained them
only to effect the arrest warrants.  He described how the brothers
had been "[d]etained, taken down, placed on the ground to be put
in handcuffs so they're out of the way because . . . . they were right
in front of door.  They were right in the little front of the doorway
next to the garage.  This [was] where everything [was] going on.
They need[ed] to be moved. . . . So they were placed into handcuffs
to secure the scene.  And then if that was not them, afterwards they
would be free to go."  Thus, the agents could not have opened the
wallets to obtain any information. Nor is there any evidence that
the agents looked inside the wallets.

        Workman's entry into the house to locate Igor was also sup-
ported by his testimony that the agents heard noises inside the
home.  The Grushkos argue that because only one woman was
found inside, this testimony was incredible.  But, a television may
have been on, or the woman may have been talking on the tele-
phone.  Nor is there any support for the broader claim that the law
enforcement officers orchestrated the scene to get inside the house
and search the place.  The record suggests otherwise.  As soon as
the agents entered the house and cleared it, they left -- never seizing
any of the device-making equipment that was laid out in front of
them -- and only returned later with a search warrant issued by a
neutral magistrate.  All of this is to say that nothing about Work-
man's testimony was "exceedingly improbable" and, therefore, the

district court's choice to believe Workman was not clearly errone-ous, nor did it err in concluding that the agents reasonably believed Igor was inside. *See Ramirez-Chilel*, 289 F.3d at 749 (citation omit-ted).

We are likewise unpersuaded by the Grushkos' claim that the search warrant was obtained using an intentionally or reck-lessly false statement. As we've detailed and as the district court found, Workman credibly testified that he did not recognize Igor outside, and the Grushkos have not otherwise shown that the search warrant was based on "a false statement knowingly and in-tentionally, or with reckless disregard for the truth[.]" *Franks*, 438 U.S. at 155–56. The Grushkos also have failed to show that Agent Workman omitted any facts -- including details about Workman's investigation and the circumstances surrounding the Grushkos' ar-rests -- that would have altered the court's probable cause finding. Quite simply, there was no error in denying the motion to sup-press.

### B.

Similarly, we are unconvinced by the Grushkos' challenge to the district court's statements during voir dire. In relevant part, the district court said this to the voir dire panel at the beginning of the trial:

> [L]adies and gentlemen, has anyone ever seen those television shows like CSI Miami, Law Enforcement, Law and Order, those things as well?

Well, let me say this about those shows. Sometimes they will want to have you believe that you can uncover DNA from the bottom of the ocean of a ship and say that the person was 6 feet 5, 330 pounds, and he was born on this particular date, and ran 300 miles as an athlete. Those shows are only for entertainment only. All right? We don't have their budget or their imagination. This is real. So you can't expect the government to come in here with all types of things, as well, fingerprints. Oh, we gonna have fingerprints. We have to have that. That's not required to prove someone guilty.

. . .

They don't have to bring in fingerprints or these types of things. Do they help? Sure, they can help.

. . .

. . . They're not required to bring in fingerprints, say I gotta have fingerprints or certain types of things, as well. They need to present whatever physical evidence they decide to do so, but you have to make your decision. You can consider those things, as well, but the law doesn't say a particular type of evidence that the government has to introduce. That's why I said they have two types of ways, direct testimony and circumstantial evidence. And you can consider it.

Now, whatever evidence they present to you, if they don't prove to satisfy their burden of proof, to meet

it beyond a reasonable doubt, you have to find the defendant not guilty.

. . .

. . . Otherwise, if they prove it beyond a reasonable doubt, of course, you are obligated to render a verdict based on what they have proved beyond a reasonable doubt based on the evidence.

. . .

Like, for example, witnesses. There's no minimum requirement as to how many witnesses. For example, you go to a Miami Heat game. If the Heat didn't win, you need to bring in 18,000 witnesses to say what happened? No. You look at the quality of the witnesses, not as to the quantity. I want to make sure you guys understand that. There is no magic number, minimum or maximum number of what needs to be presented. There is no minimum or maximum type of evidence that must be presented, as well.

The government presents its case, and if they didn't prove it, fine. You come back and say, thank you. Not guilty. And you go home back to your business. Likewise, if they prove it beyond a reasonable doubt, each essential element, each count, likewise you're obligated to return a verdict of guilty based on what has been proven beyond a reasonable doubt, provided they met each and every element, as I just described earlier.

Based on these comments, the Grushkos say that the district court impermissibly lowered the government's burden of proof during voir dire by suggesting to the jury that the absence of fingerprint evidence would not create a reasonable doubt, and, thus, that the court should have granted their motion to strike the entire panel.

"Generally, district courts have broad discretion in formulating jury instructions provided that the charge as a whole accurately reflects the law and the facts, and we will not reverse a conviction on the basis of a jury charge unless the issues of law were presented inaccurately, or the charge improperly guided the jury in such a substantial way as to violate due process." *Prather*, 205 F.3d at 1270 (quotation marks omitted).  Under the Due Process Clause, the prosecution must prove every element of the offense beyond a reasonable doubt. *In re Winship*, 397 U.S. 358, 364 (1970).

Our threshold inquiry asks whether the challenged portion of the instruction creates a mandatory presumption or a permissive inference. *Francis v. Franklin*, 471 U.S. 307, 313–14 (1985).  Mandatory "presumptions violate the Due Process Clause if they relieve the [government] of the burden of persuasion on an element of an offense." *Id.* at 314.  Conversely, "[a] permissive inference violates the Due Process Clause only if the suggested conclusion is not one that reason and common sense justify in light of the proven facts before the jury." *Id.* at 314–15.  Additionally, "[a] jury is presumed to follow the instructions given to it by the district judge." *United States v. Ramirez*, 426 F.3d 1344, 1352 (11th Cir. 2005).

The district court did not abuse its discretion when it made comments to the voir dire panel about the types of evidence that might be seen on a television show.  As we see it, the court's discussion about television shows and the nature of forensic evidence presented on them was unnecessary, unwise and should have been avoided.  Indeed, at that point in the trial, whether the government would present fingerprint evidence or other forensic evidence remained to be seen.  Although this language was ill-advised, examining the instructions as a whole, we cannot say that the district court committed reversible error.  The court never suggested that the government did not have to prove each of the elements of the charged crimes, or that the government was relieved of its burden of establishing each element beyond a reasonable doubt.  We do not read the district court's words as having impermissibly created a mandatory presumption in favor of the government, nor can we say that its words entitled the jury to discount the defense's arguments in closing about whether the absence of fingerprint evidence created a reasonable doubt.

Moreover, even when making the statements at issue, the district court repeatedly discussed the government's proper burden of proof, three times telling the jury that the government must prove its case "beyond a reasonable doubt."  The court also instructed the jury on the applicable burden of proof before opening arguments.[3]    And, importantly, the district court's formal

---

[3] At that point, the court said:

instructions at the end of the case unambiguously stated that "[t]he [g]overnment must prove guilt beyond a reasonable doubt" and properly defined "reasonable doubt." The district court explained in detail and in conformity with our law what a "reasonable doubt" meant. *See* Eleventh Circuit Pattern Jury Instructions (Criminal Cases), Basic Instruction 3. The jury is presumed to have followed those instructions. *See Ramirez*, 426 F.3d at 1352.[4]

---

As you know, this is a criminal case. There are three basic rules about a criminal case that you must keep in mind.

First, the defendant is presumed innocent until proven guilty. The superseding indictment against the defendant brought by the government is only an accusation and nothing more. It is not proof of guilt or anything else. The defendant, therefore, starts out with a clean slate.

Second, the burden of proof is on the government until the very end of the case. The defendant has no burden to prove his innocence or to prove anything -- any evidence or to testify. Since the defendant has the right to remain silent and may not choose whether to testify -- and may choose whether to testify, you cannot legally put any weight on a defendant's choice not to testify. It is not evidence.

Third, the government must prove the defendant's guilt beyond a reasonable doubt. I will give you further instructions on this point later. But bear in mind the level of proof required is high.

[4] When formally instructing the jury, the court said:

The Duty to Follow Instructions and the Presumption of Innocence

Your decision must be based only on the evidence presented during the trial. You must not be influenced in any way by either sympathy for or prejudice against a Defendant or the Government.

You must follow the law as I explain it -- even if you do not agree with the law -- and you must follow all of my instructions as a whole. You must not single out or disregard any of the Court's instructions on the law.

The Superseding Indictment or formal charge against a Defendant isn't evidence of guilt. The law presumes every Defendant is innocent. A Defendant does not have to prove his innocence or produce any evidence at all. A Defendant does not have to testify, and if a Defendant chose not to testify, you cannot consider that in any way while making your decision. The Government must prove guilt beyond a reasonable doubt. If it fails to do so, you must find the Defendants not guilty.

Definition of "Reasonable Doubt"

The Government's burden of proof is heavy, but it doesn't have to prove a Defendant's guilt beyond all possible doubt. The Government's proof only has to exclude any "reasonable doubt" concerning a Defendant's guilt.

A "reasonable doubt" is a real doubt, based on your reason and common sense after you've carefully and impartially considered all the evidence in the case.

"Proof beyond a reasonable doubt" is proof so convincing that you would be willing to rely and act on it without hesitation in the most important of your own affairs. If you are convinced that a Defendant has been proved guilty beyond a reasonable doubt, say so. If you are not convinced, say so.

On this record, the court's instructions did not rise to the level of mischaracterizing the government's burden, nor otherwise violating the Grushkos' due process rights. We can discern no abuse of discretion in the trial court's decision to deny the motion to strike the entire jury panel. *See Sullivan*, 508 U.S. at 279–81.

## C.

The Grushkos also raise several challenges to their sentences. We are unpersuaded.

First, the district court did not err in applying two-level enhancements to their base offense levels for possessing device-making equipment. Under the guidelines, a defendant's offense level is increased by two if the offense conduct involved the possession or use of any device-making equipment or authentication feature. U.S.S.G. § 2B1.1(b)(11)(A). As we've said many times, "[i]mpermissible double counting occurs only when one part of the Guidelines is applied to increase a defendant's punishment on account of a kind of harm that has already been fully accounted for by application of another part of the Guidelines." *United States v. Suarez*, 893 F.3d 1330, 1336 (11th Cir. 2018) (quotation marks omitted). On the other hand, double counting is permissible where: (1) the Sentencing Commission intended the result; and (2) each guideline section in question concerns a conceptually separate consideration related to sentencing. *Id.* We presume that the Sentencing Commission intended to apply separate guideline sections cumulatively unless we are specifically directed otherwise. *Id.* Additionally, the

application of multiple guidelines sections can be triggered by the same conduct. *Id.* at 1337.

In this case, the two-level enhancement pursuant to § 2B1.1(b)(11)(A) was properly applied to the brothers' sentences.[5] The defendants do not dispute that they possessed or used any device-making equipment or authentication feature. Rather, the Grushkos appear to be saying that the district court's application of the § 2B1.1(b)(11)(A) two-level enhancement punished them twice for the same conduct, ostensibly because they were each convicted of possessing device-making equipment in violation of 18 U.S.C. § 1029(a)(4). However, impermissible double counting does not occur when a substantive conviction informs the district court's application of a guideline enhancement.

Nor can we say that the district court clearly erred in applying two-level aggravating-role enhancements. Under the Sentencing Guidelines, a defendant's offense level may be enhanced by two levels if he was an organizer, leader, manager, or supervisor in any criminal activity that involved less than five participants. *See* U.S.S.G. § 3B1.1(c). As we've interpreted this provision, "[t]he

---

[5] Although the Grushkos objected to the two-level enhancement pursuant to § 2B1.1(b)(11)(A) before the district court, they did not argue that it constituted impermissible double counting. Accordingly, we review the claim for plain error. *See Suarez*, 893 F.3d at 1336. However, it does not matter which standard of review we apply since there was no error, plain or otherwise, when the district court applied the two-level enhancement pursuant to § 2B1.1(b)(11)(A).

assertion of control or influence over only one individual is enough to support a § 3B1.1(c) enhancement." *United States v. Phillips*, 287 F.3d 1053, 1058 (11th Cir. 2002) (quotation marks omitted). Moreover, "[t]he defendant does not have to be the sole leader of the conspiracy for the enhancement to apply, and the decision of the district court on this issue is entitled to deference on appeal." *United States v. Barrington*, 648 F.3d 1178, 1200 (11th Cir. 2011).

When determining whether a defendant is an organizer or leader, we consider:

> [(1)] the exercise of decision making authority, [(2)] the nature of participation in the commission of the offense, [(3)] the recruitment of accomplices, [(4)] the claimed right to a larger share of the fruits of the crime, [(5)] the degree of participation in planning or organizing the offense, [(6)] the nature and scope of the illegal activity, and [(7)] the degree of control and authority exercised over others.

U.S.S.G. § 3B1.1 cmt. n.4. However, there is no requirement that all the factors must be present for the enhancement to apply. *Martinez*, 584 F.3d at 1026.

The record supports a finding that both Denis and Igor were the organizers and the leaders of the scheme to defraud Target. Their scheme involved another participant, Vadym Vozniuk, whom the Grushkos instructed how to install skimmer devices on ATM machines, and they provided him with access devices to purchase items. Further, the Grushkos paid Vozniuk using a portion

of their proceeds, which suggests that they claimed a larger share. *See* U.S.S.G. § 3B1.1 cmt. n.4.  This is more than enough to establish that the Grushkos had "control or influence over" Vozniuk. *See Phillips*, 287 F.3d at 1058 (quotation marks omitted).

There was considerably more evidence found by law enforcement at the Grushkos' house that illustrated their aggravating roles in the scheme, including: (1) a spreadsheet that tracked every fraudulent pickup and return at Target; (2) a document called "all_target.txt" that contained a list of potential Target stores to hit; (3) an assortment of planning documents like "Basic Carding Tutorial 1.txt" and "How not to get caught Car.txt," that allowed the Grushkos to learn the craft and attempt to avoid detection; and (4) a vast collection of identity-theft materials and device-making equipment that allowed the Grushkos and their coconspirator to commit the fraud.  And, significantly, there was no evidence that Vozniuk was responsible for the access devices recovered from the Grushkos' home.

In short, the record demonstrates the Grushkos' deep involvement in the planning and organization of the fraudulent scheme and their vital role in the commission of the offenses, as well as their involvement in decision making and recruitment, all of which was far more extensive than the role played by Vozniuk. *See* U.S.S.G. § 3B1.1 cmt. n.4.  To the extent the brothers argue that they could not both receive aggravating-role enhancements since they were equally involved, a defendant eligible for an aggravating-role enhancement "does not have to be the sole leader of

20-10438                Opinion of the Court                25

the conspiracy for the enhancement to apply." *Barrington*, 648 F.3d at 1200. The district court did not clearly err in applying the aggravating-role enhancements to the brothers' offense levels.

The Grushkos next argue that their sentences were procedurally unreasonable because the district court failed to adequately explain them. In reviewing a sentence for procedural reasonableness, we must "'ensure that the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence -- including an explanation for any deviation from the Guidelines range.'" *United States v. Pugh*, 515 F.3d 1179, 1190 (11th Cir. 2008) (quoting *Gall v. United States*, 552 U.S. 38, 51 (2007)).[6] When explaining a sentence, the district court must "set forth enough to satisfy [us] that [it] has considered the parties' arguments and has a reasoned basis for exercising [its] own legal

_____

[6] The § 3553(a) factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need for the sentence imposed to afford adequate deterrence; (4) the need to protect the public; (5) the need to provide the defendant with educational or vocational training or medical care; (6) the kinds of sentences available; (7) the Sentencing Guidelines range; (8) the pertinent policy statements of the Sentencing Commission; (9) the need to avoid unwanted sentencing disparities; and (10) the need to provide restitution to victims. 18 U.S.C. § 3553(a).

decisionmaking authority." *Rita v. United States*, 551 U.S. 338, 356 (2007). The district court is not required to discuss each factor individually if it acknowledges that it considered the defendant's arguments and the § 3553(a) factors. *United States v. Gonzalez*, 550 F.3d 1319, 1324 (11th Cir. 2008).

The court adequately explained the 145-month sentences that it imposed on Igor and Denis. Among other things, the district court said that it had "considered the statements of all parties, the Presentence report which contains the advisory guidelines and the statutory factors set forth in 18 U.S.C. Section 3553." *See Gonzalez*, 550 F.3d at 1324. It added that "[t]he objections raised by the defense have all been overruled." Further, the trial court remarked that the defendants had engaged in "serious," "egregious and harmful and widespread conduct," they had shown "no remorse, none whatsoever," and they had been caught with the access-devices in their possession, suggesting no end to their scheme. In sum, the district court indicated that the defendants' total sentences were needed to (1) reflect the seriousness of the offenses, promote respect for the law, and provide just punishment for the offense, (2) deter criminal conduct, and (3) protect the public; and it ordered restitution, which recognized (4) the need to provide restitution to the victims. *See* 18 U.S.C. § 3553(a)(2)(A)–(C), (a)(7).

The defendants also claim that the district court erred in calculating the amount of loss attributable to each of them, and in applying obstruction-of-justice enhancements to both of them. Despite any possible merit in these arguments, we cannot ignore that

the district court explicitly stated that it would have imposed the same total sentences even if it had decided the disputed enhancement issues in favor of the defendants.  Under our precedent, "we need not review [a sentencing] issue when (1) the district court states it would have imposed the same sentence, even absent an alleged error, and (2) the sentence is substantively reasonable." *United States v. Goldman*, 953 F.3d 1213, 1221 (11th Cir. 2020); *United States v. Keene*, 470 F.3d 1347, 1349–50 (11th Cir. 2006).

"Our rationale for this policy is to avoid 'pointless reversals and unnecessary do-overs of sentence proceedings.'" *United States v. McLellan*, 958 F.3d 1110, 1116 (11th Cir. 2020) (quoting *Keene*, 470 F.3d at 1349).  In other words, "it would make no sense to set aside [a] reasonable sentence and send the case back to the district court [because of an error in calculating the Sentencing Guidelines range] since it has already told us that it would impose exactly the same sentence, a sentence we would be compelled to affirm." *Keene*, 470 F.3d at 1350; *United States v. Henry*, 1 F.4th 1315, 1327 (11th Cir. 2021).  Notably, *Keene* applies only when -- as here -- the complained-of errors are preserved, so that the district court is aware of the dispute about the guideline application, and has the chance to determine in the first instance that the sentence is proper regardless of any error. *Keene*, 470 F.3d at 1349.  This renders any error harmless. *Id*.

So, in situations like this one -- when a district court states that the sentence it has imposed would not have changed even with a different guideline calculation -- we assume there was an

error, reduce the guideline range according to the way the defend-ant argued, and analyze whether the sentence would be substan-tively reasonable under that guideline range. *Id.* at 1349–50. The defendant has the burden of "prov[ing] that his sentence is unrea-sonable in light of the record and § 3553(a)." *Id.* Remand is not appropriate if we determine that the district court's error did not impact its ultimate sentence *and* the ultimate sentence is substan-tively reasonable. *Id.* at 1348–50.

Because of the district court's *Keene* statement in this case,[7] we need only consider the substantive reasonableness of the

---

[7] At the sentencing hearing, the government expressly invoked *Keene* and asked the district court to "clearly indicate[] that it would have imposed the same sentence, *regardless of whether the Court had decided in the defendant's favor for any sort of sentencing enhancement* so long that sentence is [reason-able]." (Emphasis added). The district court responded, "Correct. Whether the enhancement was in favor or not, my sentence will remain the same." And when the government sought clarification after the court indicated that a 121-month concurrent sentence as to the non-aggravated identity theft counts (Counts 1, 4, 5 and 6) was *not* at the high-end of the guidelines range, the court said, "I misspoke, but still I think the sentence, even what I imposed is suffi-cient, and *necessary to impose based on their role and conduct in this case.* So, I'm maintaining that sentence as the one I'm going to impose." (Emphasis added). We read this language as making it clear that the district court in-tended to impose the same sentence, regardless of any error in the guidelines calculation, thereby triggering our analysis in *Keene. Compare with United States v. Eason*, 953 F.3d 1184, 1195 n.8 (11th Cir. 2020) (declining to apply *Keene* where the district court "never 'state[d] on the record' that 'the en-hancement made no difference to the sentence it imposed'") (citation omit-ted); *United States v. Barner*, 572 F.3d 1239, 1248 (11th Cir. 2009) (declining to apply *Keene* where the district court said it was choosing to apply a guidelines

brothers' sentences, assuming their proposed lower guideline ranges to be the applicable ones. Because Denis did not propose a proper guideline range, we'll use Igor's estimation that the correct amount of loss was $165,000, and, therefore, that the brothers' guideline ranges each would have been 51 to 63 months' imprisonment for the first set of counts, plus the 24-month mandatory consecutive sentence for the last set of counts. *See* U.S.S.G. Ch. 5, Pt. A, Sentencing Table. Thus, to determine whether their sentences were reasonable under *Keene*, we assume there was some sentencing error, we assume each brother's total guidelines range was 75 to 87 months' imprisonment, and we then ask whether the sentences imposed, once scrubbed of the errors, were substantively reasonable under § 3553(a). *See Keene*, 470 F.3d. at 1349.

In considering the substantive reasonableness of a sentence, we look at the "totality of the circumstances." *Pugh*, 515 F.3d at 1190 (quotation marks omitted). The district court's sentence must be "sufficient, but not greater than necessary to comply with the purposes" listed in 18 U.S.C. § 3553(a). The court must consider all of the § 3553(a) factors, but it may give greater weight to some factors over others or even attach great weight to a single factor -- a decision that is within its sound discretion. *United States v. Rosales-Bruno*, 789 F.3d 1249, 1254 (11th Cir. 2015); *United States v. Kuhlman*, 711 F.3d 1321, 1327 (11th Cir. 2013).

---

sentence and never said it would have imposed the same sentence if there were errors in the guidelines calculation).

However, a sentence may be substantively unreasonable when a court unjustifiably relies on any single § 3553(a) factor, fails to consider pertinent § 3553(a) factors, bases the sentence on impermissible factors, or selects the sentence arbitrarily. *Pugh*, 515 F.3d at 1191–92. A sentence that suffers from one of these symptoms is not *per se* unreasonable; rather, we must examine the totality of the circumstances to determine the sentence's reasonableness. *Id.* at 1192. "[W]e will not second guess the weight (or lack thereof) that the [court] accorded to a given [§ 3553(a)] factor . . . as long as the sentence ultimately imposed is reasonable in light of all the circumstances presented." *United States v. Snipes*, 611 F.3d 855, 872 (11th Cir. 2010) (quotation marks, alteration and emphasis omitted). We will vacate a sentence only if we are left with the "definite and firm" conviction that the district court committed a clear error of judgment in weighing the § 3553(a) factors by arriving at a sentence that is outside the range of reasonable sentences dictated by the facts of the case. *United States v. Irey*, 612 F.3d 1160, 1190 (11th Cir. 2010) (en banc) (quotation marks omitted).

Additionally, although the district court has discretion to impose a sentence outside of the guideline range, a major variance requires a more significant justification than a minor one. *Id.* at 1196. However, we do not presume that a sentence outside of the guideline range is unreasonable and give deference to the district court's decision that the § 3553(a) factors support its chosen sentence. *Pugh*, 515 F.3d at 1190. Further, a sentence imposed below

the statutory maximum penalty is an indicator of a reasonable sentence. *Gonzalez*, 550 F.3d at 1324.

Here, we cannot say that the district court's imposition of a 145-month total sentence on each brother was substantively unreasonable. For starters, the district court gave a sufficient explanation for the sentences it imposed. As we've noted, the district court explicitly acknowledged that it had considered both brothers' arguments and the § 3553(a) factors prior to sentencing. The district court also stressed the breadth and harmfulness of the brothers' scheme, that they had been caught while the scheme was still going on, and that they had failed to show any remorse, "none whatsoever." In so doing, the court indicated that its total sentences needed to (1) reflect the seriousness of the offenses, promote respect for the law, and provide just punishment; (2) deter criminal conduct; (3) protect the public; and (4) provide restitution to the victims. *See* 18 U.S.C. § 3553(a)(2)(A)–(C), (a)(7). As for the Grushkos' argument that the district court imposed its sentences, based, in part, on an unproven number of access devices, we read the record as having provided many other reasonable bases for the district court's decision, and, in any event, the brothers do not dispute that over 300 access devices were recovered, which remains a high number. And to the extent the district court gave considerable weight to the need for the brothers' total sentences to deter future criminal conduct, it was well within the court's discretion to do so. *Kuhlman*, 711 F.3d at 1327.

Looking at the record as a whole, we are satisfied that their total sentences were substantively reasonable. *See Keene*, 470 F.3d at 1349–50. As the government explained at sentencing, the Grushkos engineered "an incredibly widespread and sophisticated scheme" against Target and "r[an] a massive access device fraud, credit card fraud and identity theft factory from their [home]." *See* 18 U.S.C. § 3553(a)(1) (nature and circumstances of the offense). Indeed, "[t]his was not a one-time incident. This was not a lapse of judgment. . . . They were literally manufacturing the skimming devices of the type that are used by criminals in this district constantly to steal from Floridians, to steal from people in our community." *See* 18 U.S.C. § 3553(a)(1)–(2) (characteristics of the defendants, and the need to reflect the seriousness of the offense, deter criminal conduct, and protect the public). And even once they were caught, the Grushkos showed "no remorse or contrition whatsoever." *See* 18 U.S.C. § 3553(a)(2) (need to promote respect for the law, provide just punishment, deter criminal conduct, and protect the public).

Through their scheme, the Grushkos committed a set of offenses, which "in [the South Florida] community is incredibly widespread, underscoring the need for deterrence," especially since it is "incredibly hard to catch perpetrators of this type of crime in part because of the type of sophisticated means of concealment used by individuals such as the Grushko brothers to perpetrate and get away with their crimes." *See* 18 U.S.C. § 3553(a)(2)(B), (C) (need to promote deterrence and protect the public from further crimes of

the defendants). Notably, these are the types of offenses that, even "if the [Grushkos] were removed from this community," they could continue committing elsewhere. *See* 18 U.S.C. § 3553(a)(2)(C) (need to protect the public from further crimes of the defendants).

It's also worth noting that the total 121-month sentences attributable to Counts 1 and 4 through 6 were well below the statutory maximum of 180 months' imprisonment for two of those counts (Counts 5 and 6). Likewise, the 24-month sentences for Counts 7 through 9 were well below the statutory maximum of 72 months' imprisonment. All of this suggests to us that the brothers' total sentences were substantively reasonable. *See Gonzalez*, 550 F.3d at 1324. Thus, even if we assume that the district court erred in calculating the loss amount and in applying the obstruction-of-justice enhancements, those errors are harmless under our decision in *Keene*. The district court imposed an otherwise substantively reasonable total sentence for each defendant.

**AFFIRMED**.

20-10438                Jordan, J., Concurring                    1

JORDAN, Circuit Judge, Concurring.

I join the court's opinion in full. I write separately about the district court's comments to the jury panel during voir dire.

Among other things, the district court told the jury panel the following during voir dire:

◆ "[H]as anyone seen those television shows like CSI Miami, . . . Law and Order. . . ? Those shows are for entertainment only. . . . We don't have their budget or their imagination. This is real. So you can't expect the government to come in here with all types of things, as well, fingerprints. Oh, we gonna have fingerprints. We have to have that. That's not required to prove someone guilty. . . . They don't have to bring in fingerprints or these types of things."

◆ "There's no minimum requirement as to how many witnesses. For example, you go to a Miami Heat game. If the Heat didn't win, you need to bring in 18,000 witnesses to say what happened? No. You look at the quality of the witnesses, not as to the quantity. I want to make sure you guys understand that."

Like my colleagues, I do not believe that the district court's remarks required the striking of the jury panel. The reason is that the district court—during voir dire, before opening statements, and in its final instructions—repeatedly told the jury that the government bore the burden of proving the Grushkos guilty beyond a reasonable doubt and explained what reasonable doubt meant. Those

2                    Jordan, J., Concurring                    20-10438

instructions eliminated the possibility that the trial jury believed that the government had a lower burden of proof.

Though the comments did not constitute reversible error, they were in my view improper. As the Supreme Court said more than a century ago, "[i]t is obvious that under any system of jury trials the influence of the trial judge on the jury is necessarily and properly of great weight, and that his lightest word or intimation is received with deference, and may prove controlling." *Starr v. United States*, 153 U.S. 614, 626 (1894). What was true then remains true today, and here the district court's comments were inappropriate or at the very least unwise.

In some cases, it may be acceptable for the prosecution to explain at voir dire that the government cannot always present forensic evidence of the sort depicted in television, cable, or the movies. *See, e.g., United States v. Jefferson*, 432 F. App'x 382, 388 (5th Cir. 2011). But it was wrong, in my view, for the district court to make that same point while including itself in the collective "we" along with the government ("We don't have their budget or their imagination."). The jury panel, which was just being introduced to voir dire in a federal criminal case, could have thought less of the government's burden of proof because it was being told by the district court that fingerprints and other forensic evidence were unnecessary. *Cf. Griggs v. State*, 230 So.3d 943, 947 (Fla. 1st DCA 2017) (trial court's comments, including that lack of physical evidence "doesn't mean there wasn't a crime," were problematic because they "reinforced a prosecution-friendly view" of the case

against the defendant). And the panel could have believed, if only for a short while, that the district court was somehow involved in the investigation and prosecution of the Grushkos. That is not a crazy supposition. Not all citizens understand how our criminal justice system works, and jury selection may be their first experience in a courtroom. Our system, moreover, is not used worldwide. Some civil law jurisdictions use investigating magistrates whose job it is to find and analyze the evidence, determine whether formal charges should be filed, decide which persons should be charged, and prepare a dossier with findings. *See, e.g.,* Mary C. Daly, *Some Thoughts on the Difference in Criminal Trials in the Civil and Common Law Systems*, 2 J. Inst. Study of Legal Ethics 65, 62-72 (1999) (describing the French criminal justice system and its use of investigating magistrates).

The same goes for the comment about the number of witnesses. To explain that no magical number of witnesses are necessary on a given point, the district court used an example of the Miami Heat, a professional basketball team, losing a game in front of 18,000 fans. It noted that one would not need all of those in attendance as witnesses to prove that the Heat lost. The example seems relatively harmless on the surface, but is more problematic when one realizes that it uses an objectively verifiable fact—a loss by the Heat—that cannot be denied. In criminal trials, not all evidence is so clear or undisputed. By juxtaposing the need for less witnesses to prove the Heat's undeniable defeat, the district court risked suggesting that a single witness or a few witnesses—despite the quality

4                         Jordan, J., Concurring                    20-10438

of the testimony—could establish a given proposition beyond a reasonable doubt.

I understand that the district court was trying to use images and concepts that would have registered or connected with prospective jurors in the 21st century. But sometimes using the tried and true—even if boring and unimaginative—is a better and safer alternative. *See, e.g.,* Benchbook for U.S. District Judges §§ 2.06 & 2.07 (Fed. Jud. Ctr. 6th ed. 2013).